UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Saline River Properties, LLC,
a Michigan limited liability company,

       Plaintiff/Counter-Defendant,

v.                                   Case No. 10-10507

Johnson Controls, Inc. , a Wisconsin          Honorable Sean F. Cox
corporation,

       Defendant/Counter-Plaintiff;

          *Consolidated with*

Saline River Properties, LLC,
a Michigan limited liability company,

       Plaintiff,

v.                                   Case No. 10-13406

Johnson Controls, Inc., a Wisconsin          Honorable Sean F. Cox
corporation,

       Defendant.

_____/

## OPINION & ORDER

      There are two related cases that are now before this Court and have been consolidated for

pretrial proceedings.  Both cases involve the same parties and the same property –  a 22 acre

parcel in Saline, Michigan ("the Property").  Johnson Controls, Inc. ("JCI") previously owned or

operated a facility on the Property.  In 1993, JCI consented to an Administrative Order on

Consent ("AOC") by the Environmental Protection Agency ("E.P.A."), which: 1) requires JCI to take various environmental remedial actions by specified dates; and 2) provides stipulated penalties for failing to do so.

There are four dispositive motions currently pending before the Court:  1)  JCI's Motion to Dismiss Plaintiff's Amended Complaint (D.E. No. 41), wherein JCI asks the Court to dismiss Saline's breach of contract, nuisance and negligence claims; 2) Salines' Motion for Summary Judgment (D.E. No. 47), wherein Saline asks the Court to rule in its favor on its citizen suit to enforce the AOC; 3)  JCI's Cross-Motion for Summary Judgment (D.E. No. 71), wherein JCI asks the Court to rule in its favor on Saline's citizen suit to enforce the AOC; and 4) Saline's Motion For Summary Judgment on JCI's Counterclaims (D.E. No. 81),  wherein Saline seeks summary judgment on JCI's counterclaims, brought under CERCLA and NREPA.

For the reasons set forth below, the Court shall:  1)  GRANT JCI's Motion to Dismiss Plaintiff's Amended Complaint and shall dismiss Saline's state-law claims of breach of contract, nuisance and negligence; 2) DENY Saline's Motion for Summary Judgment as to its citizen suit to enforce the AOC; 3) GRANT IN PART JCI's cross-motion for summary judgment as to Saline's citizen suit to enforce the AOC; and 4) DENY Saline's Motion for Summary Judgment on JCI's Counterclaims.

## BACKGROUND

### Case No. 10-10507

Saline filed Case No. 10-10507, based solely upon federal question jurisdiction, on February 4, 2010, asserting the following five counts: "Citizen Suit to Enforce EPA Order" (Count I); "Breach of Contract" (Count II); "Negligence and Negligence Per Se" (Count III);

2

"Nuisance" (Count IV); and "Tortious Interference" (Count V).

JCI filed a Motion to Dismiss.  In an Opinion & Order issued on June 25, 2010, this Court denied JCI's Motion to Dismiss as to Count I, the only federal count asserted, and dismissed Saline's state-law claims without prejudice because it declined to exercise supplemental jurisdiction over those state-law claims.  (D.E. No. 14).

Thereafter, Saline filed a First Amended Complaint, (D.E. No. 28), which is its operative complaint in Case No. 10-10507 and it asserts just one count – a citizen suit to enforce the AOC.

JCI asserts the following counterclaims against Saline in Case No. 10-10507: "CERCLA § 107 Cost Recovery" (Count I); "CERCLA Declaratory Judgment" (Count II); "Cost Recovery – Michigan Natural Resources and Environmental Protection Act" (Count III); and "Declaratory Relief – NREPA" (Count IV). [1]

**Case No. 10-13406**

After this Court issued its June 25, 2010 Opinion & Order declining to exercise supplemental jurisdiction over Saline's state-law claims, Saline filed an action in state court against JCI.  In that state-court action, Saline asserted breach of contract, nuisance, and negligence claims against JCI.  JCI removed the action on August 25, 2010 – based upon diversity jurisdiction.  That action was styled as Case No. 10-13406 and was assigned to the Honorable Lawrence P. Zatkoff.

On September 20, 2010, JCI filed a Motion To Dismiss Plaintiff's Complaint in Case No.

---

[1]After JCI asserted those counterclaims, Saline filed a motion to dismiss the counterclaims, which was denied by this Court in its entirety.  (D.E. No. 46).  Thus, all four of JCI's counterclaims remain.

10-13406.  (D.E. No. 6 in Case No. 10-13406).

On October 11, 2010, Saline filed an Amended Complaint (D.E. No. 10) and a Response to JCI's Motion to Dismiss.  (D.E. No. 9).  Saline's First Amended Complaint asserts the following counts: "Breach of Contract" (Count I); "Nuisance" (Count II); "Negligence" "(Alternative to Count I)" (Count III).

**The Two Cases Were Consolidated By This Court**

Case No. 10-13406, was originally assigned to Judge Zatkoff but was reassigned to this Court as a companion case on January 5, 2011.  (D.E. No. 20).

On February 24, 2011, this Court consolidated Case No. 10-10507 with Case No. 10-13406 for pretrial purposes.  (Docket Entry No. 39).

On October 13, 2011, this Court held a hearing on the motions that are currently pending in these actions.

**Standards Of Decision**

When ruling on a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6), the court must construe the complaint in a light most favorable to the plaintiff and accept all the well-pleaded factual allegations as true.  *Evans-Marshall v. Board of Educ.*, 428 F.3d 223, 228 (6th Cir. 2005).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, __ U.S. __, 129 S.Ct. 1937, 1948 (2009).  Although a heightened fact pleading of specifics is not required, the plaintiff must bring forth "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In practice, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some

4

viable legal theory. *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 726 (6th Cir. 1996).

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56 (c). The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admission on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting FED. R. CIV. P. 56(e)).

## ANALYSIS

## I. JCI's Motion To Dismiss Saline's Breach Of Contract, Nuisance, And Negligence Claims, Brought Under Michigan Law

JCI's Motion to Dismiss asks this Court to dismiss Saline's breach of contract, nuisance and negligence claims for failure to state a claim under FED. R. CIV. P. 12(b)(6). All three of those claims are brought under Michigan law.

### A. Breach Of Contract

Count I of Saline's complaint in Case No. 10-13406 asserts a breach of contract claim.

In its motion, JCI asserts that Saline's breach of contract count fails to state a claim for several reasons. First, JCI contends that Saline has not sufficiently pled a breach of contract claim under Michigan law and that the AOC is not a contract and it therefore cannot be the basis

5

for a breach of contract claim.  Second, JCI contends that even if the AOC were construed as a contract, Saline, who is not a party to the alleged contract, has not sufficiently alleged that it is a third-party beneficiary under Michigan law.  Third, JCI asserts that any alleged breaches of the AOC that occurred more than six years ago are barred by the applicable statute of limitations.

Saline's Breach of Contract claim alleges that "[a]s a subsequent purchaser of the Property, Plaintiff [Saline] was and is an intended third party beneficiary of the *agreement between JCI and EPA as embodied in the AOC*."  (Saline's First Am. Compl. at 8) (emphasis added).  Not all "agreements," however, are valid contracts.

"To plead a legally cognizable claim of breach of contract" under Michigan law, a plaintiff "must first establish the existence of a valid contract between the parties."  *City of South Lyon v. Demaria Building Co.*, 2010 WL 334569 (Mich.App. 2010) (citing *Pawlak v. Redox Corp.*, 182 Mich.App. 758, 765 (1990).  The essential elements of a valid contract under Michigan law are: 1) parties competent to contract; 2) a proper subject matter, 3) a legal consideration; 4) mutuality of agreement, and 5) mutuality of obligation.  *City of South Lyon, supra; Thomas v. Leja*, 187 Mich.App. 418, 422 (1991).

As JCI notes in its motion, Saline has not alleged any of the above elements in its Breach of Contract Count.

JCI also contends that Saline's Breach of Contract Count fails to state a claim because the AOC is not a "contract."

In response to JCI's argument that Count I fails to state a claim because the AOC is not a contract, Saline asserts that "[a] simple reading of the AOC reveals that it was the product of negotiation between JCI and EPA and not merely an edict imposed upon JCI by EPA."  (D.E. 44

6

at 5).  Saline further asserts:

> Moreover, the law views consent decrees essentially as settlement agreements.
> *Williams v. Vukovich,* 720 F.2d 909 (6th Cir. 1983).  Because consent decrees and
> orders have many of the same attributes of ordinary contracts they should be
> construed basically as contracts.

(*Id.*) (citing *United States v. ITT Continental Baking Co.*, 420 U.S. 223 (1975)).

In *Williams,* the Sixth Circuit discussed the nature of consent decrees entered into during

judicial actions and noted that a "consent decree has attributes of both a contract and of a judicial

act."  *Williams,* 720 F.2d at 920.  Here, however, Saline's breach of contract claim *is not based*

*upon a consent decree.*  Rather, it is based upon the AOC.  The AOC is an administrative order

issued by the EPA.  (*See* AOC at ¶ 1) ("The Administrator of the United States [EPA]" "is

issuing this Administrative Order on Consent" to JCI "under Section 3008(h) of the Solid Waste

Disposal Act, commonly referred to as the Resource Conservation and Recovery Act of 1976

(RCRA)").

Saline has not presented the Court with any authority to support its position that an

administrative order can be considered "a contract" for purposes of asserting a breach of contract

claim under Michigan law.   The Court shall therefore dismiss Saline's breach of contract claim.[2]

## B.    Nuisance

Next, JCI challenges Saline's nuisance claim, asserted in Count II of its First Amended

Complaint.  In challenging this Count, JCI makes two arguments: 1) that Saline has failed to

plead sufficient facts to establish a nuisance claim; and 2) Saline's nuisance claim is barred by

---

[2]Given that ruling, the Court need not address JCI's remaining grounds for dismissal of
this claim (i.e., failure to sufficiently allege third-party beneficiary status and statute of
limitations).

the applicable statute of limitations.

The Court agrees that Saline's nuisance claim is barred by the applicable statute of limitations.

Saline's nuisance claim is subject to a three-year limitations period for actions to recover damages to property.  M.C.L. § 600.5805(10); *Hicks Family Limited Partnership v. 1st National Bank of Howell*, 2006 WL 2818514 (Mich.App. 2006).  Saline, which purchased the Property in 2006, concedes that its nuisance claim is time-barred unless the Court "appl[ies] the continuing violations doctrine to preserve this claim." (Saline's Resp. Br., D.E. No. 44, at 11).

"Under the doctrine, sometimes referred to as the 'continuing wrongs doctrine,' when the nuisance is of a continuing nature, the period of limitations does not begin to run on the occurrence of the first wrongful act; rather, the period of limitations will not begin to run until the continuing wrong is abated." *Froling Revocable Living Trust v. Bloomfield Hills Country Club*, 283 Mich.App. 264, 280 (2009).  As explained in *Froling*, however, "*Garg*[3] and its progeny completely and retroactively abrogated the common-law continuing wrongs doctrine in the jurisprudence of [Michigan], including in nuisance and trespass cases." *Id*. at 288.  Accordingly, the Court shall dismiss this count as time-barred.

## C.    Negligence

Count III of Saline's First Amended Complaint asserts, as an alternative to its Breach of Contract Claim, a Negligence Claim.

To establish a prima facie case of negligence under Michigan law, a plaintiff must allege

---

[3]*Garg v. Macomb Co. Community Mental Health Svs.,* 472 Mich. 263 (2005).

and prove four elements: 1) a legal duty owed by the defendant to the plaintiff; 2) a breach of that duty; 3) causation; and 4) damages. *Case v. Consumer Power Co.*, 463 Mich. 1, 6 (2000). Proof of causation requires both cause in fact and legal, or proximate, cause. *Haliw v. Sterling Heights*, 464 Mich. 297 (2001).

In its motion, JCI asserts that Saline has not sufficiently alleged, and cannot establish, the duty element.

_____ "There can be no actionable negligence where there is no legal duty." *Etter v. Michigan Bell Tel. Co.*, 179 Mich.App. 551, 555 1989). The existence of a duty of care is a question of law for the Court. *Id.*

Here, Saline asserts that it can bring a negligence claim against JCI based on three different alleged legal duties. (See Saline's First Am. Compl. at ¶ 36). First, Saline asserts that JCI owed Saline and "the People of the State of Michigan" a legal duty to comply with RCRA. Second, Saline contends that JCI owed Saline a legal duty to comply with the AOC issued by the EPA. It has offered no authority, however, to support its position that Saline was owed a legal duty under either of those theories that would enable it to bring a negligence claim under Michigan law.

Finally, Saline asserts that JCI owed it a legal duty based upon Section 324A of the Restatement of Torts 2d, as discussed in *Smith v. Allendale Mutual Ins. Co.*, 410 Mich. 85, 712 (1981). Section 324A of the Restatement of Torts, 2d , provides:

> One who undertakes, gratuitously or for consideration to render services to another which he should recognize as necessary for the protection of third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if:
>     (a) his failure to exercise reasonable care increases the risk of harm, or

> (b) he has undertaken to perform a duty by the other to the third person, or
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Thus, Section 324A "provides that, in certain circumstances, when one undertakes to render services to another, the actor can be liable to third parties for the failure to exercise reasonable care in performing the services." *Nalepa v. Plymouth-Canton Comm. School Dist.*, 207 Mich.App. 580, 592 (1994).

JCI contends that no duty arises on its part under § 324A for numerous reasons, including that: 1) the section only applies to liability for "physical harm" and here Saline is seeking economic damages – not damages for physical harm; and 2) Saline has not alleged that JCI entered into the AOC for Saline's benefit, which is required under § 324A.

The Court agrees that Saline has not established that a duty arose under *Smith* or Section 324A. In *Smith:*

> the defendants-insurance companies conducted fire inspections of their insureds' premises. After fires occurred injuring or killing several of the insureds' employees, the plaintiffs-employees filed complaints against the insurance companies alleging that the companies breached an assumed duty of care to them by failing to inspect carefully.

*Id.* The Michigan Supreme Court ruled that the defendants-insurance companies did not owe the plaintiff-employees a duty of care. As explained in *Nalepa*:

> When considering the proposition set forth in § 324A, the Court stressed that in order for the duty to arise, it is not enough for the actor merely to act; rather, the actor must have undertaken to render services to another. *Smith, supra*, at 716, 303 N.W.2d 702. There, the Court concluded that no duty would arise unless the insurance companies intended or agreed to benefit either the employers or the plaintiff-employees. *Id*. The Court held that this intention or agreement will not be found, however, with the mere conferral of some benefit to those parties, because persons pursuing their own interests often benefit others. *Id*. at 717-718,

10

303 N.W.2d 702.  The evidence must show that the actor either assumed an
obligation or intended to render services for the benefit of another.  *Id.*

*Nalepa,* 207 Mich.App. at 592.  The *Smith* court "determined that when the defendants-insurance

companies inspected the insureds' premises, they did so with their own interests in mind –

namely risk reduction, a basis for rate increases or decreases, and so forth – and not to benefit

either the insureds or the plaintiffs-employees."  *Id.* at 592-93.

Here, Saline does not allege that JCI entered into the AOC for Saline's benefit, nor does it

set forth any evidence that could establish that JCI entered into the AOC for Saline's benefit.

Accordingly, the Court shall dismiss Saline's negligence claim.

## II.   Cross-Motions For Summary Judgment On Saline's Citizen Suit To Enforce The AOC

Saline's sole claim in Case No. 10-10507 is a citizen suit to enforce the AOC, brought

pursuant to 42 U.S.C. § 6972(a)(1)(A).[4]  The parties have cross-motions as to this claim.

"In 1976, Congress passed the Resource Conservation and Recovery Act ("RCRA"),

which amended the Solid Waste Disposal Act of 1965, 42 U.S.C. §§ 6901-6992k.  Congress

enacted the RCRA to end the environmental and public health risks associated with

mismanagement of hazardous waste."  *United States v. Commonwealth of Kentucky*, 252 F.3d

816, 821-22 (6th Cir. 2001).

Under 42 U.S.C. § 6972 of the RCRA, citizens are authorized to bring suit in

---

[4]It is undisputed that the EPA has not filed suit against Plaintiff to enforce the AOC.
Under the RCRA, the EPA may intervene in this action as a matter of right (*see* 42 U.S.C. §
6972(d)) but it has not done so.

11

substantially the same capacity as provided for in the Clean Water Act, 33 U.S.C. § 1251 *et seq.* *Ailor v. City of Maynardville, Tennessee*, 368 F.3d 587, 601 (6th Cir. 2004). "Likewise, the relief available under § 6972 of the RCRA is virtually identical to that available under the CWA, i.e., injunctive relief, civil penalties, and attorney fees. *See* 42 U.S.C. § 6928(a). The RCRA, like the CWA, does not provide for compensatory damages." *Ailor,* 368 F.3d at 601.

Section 6972(a)(1)(A) of the RCRA provides that "any person may commence a civil action on his own behalf" against any person "who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or *order* which has become effective pursuant to this chapter." 42 U.S.C. § 6972(a)(1)(A). (emphasis added).

The Act provides that the "district court shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce the . . . order, referred to in paragraph (1)(A)" and "to apply any appropriate civil penalties under section 6928(a) and (g) of this title." 42 U.S.C. § 6972(a). Thus, a "successful outcome in a citizen suit can result in a court order for equitable relief and perhaps a civil penalty." 1 *RCRA and Superfund: A Practice Guide*, 3d § 5:37 (2009).

Here, Saline has brought a citizen suit, pursuant to § 6972(a)(1)(A) of the RCRA, asking this Court to enforce the AOC. Saline requests that the Court: 1) find JCI to be in violation of the AOC; 2) require JCI to "complete removal of hazardous waste and hazardous constituents necessary to allow unrestricted residential use" of the Property within 60 days; 3) require JCI to pay the accumulated Stipulated Penalties for violations of the AOC to the United States Treasury, "or in the alternative to impose daily statutory penalties in excess of the Stipulated Penalty amounts in the Order," and 4) require JCI to reimburse Saline its costs and attorney fees incurred

12

in pursuing its citizen suit under the RCRA.  (Saline's First Am. Compl. at 11).

  In its Motion for Summary Judgment, Saline asserts that there is no need for a trial because the evidence establishes that JCI violated the AOC in the following ways: 1) by failing to submit written quarterly progress reports; 2) failing to demonstrate environmental indicators; and 3) failing to submit an approvable corrective measures proposal.  Saline asks the Court to order JCI to pay the following stipulated penalties, with respect to the above alleged violations, to the U.S. Treasury: 1) approximately $12,000,000 for failure to submit written quarterly progress reports; 2) $6,756,000 for "failure to adequately demonstrate current human exposures under control;" 3) $6,756,000 for "failure to adequately demonstrate groundwater migration stabilized;" and 4) $4,772,000 for "failure to submit Final Corrective Measures Proposal." (Saline's Br. at 19-20).  Saline also asks this Court to order JCI to "[s]ubmit within 60 days a demonstration meeting the requirements for the Environmental Indicators," "[s]ubmit within 90 days a Final Corrective Measures Proposal designed to remove all contaminated soil and river sediments and restore contaminated groundwater, in the shortest achievable timeframe using best available technologies."  (Saline's Br. at 20).  Finally, Saline seeks an award of attorney fees it incurred in this action.

  In its cross-motion for Summary Judgment, JCI also contends that no trial is necessary and that JCI is entitled to summary judgment on Saline's citizen suit.  JCI contends that the evidence establishes that JCI met all deadlines under the AOC.  JCI further contends that Plaintiff's demand for stipulated penalties has no merit and that Saline is not entitled to the issuance of an injunction.

A.    Has JCI Violated The Terms Of The AOC?

Again, Saline asserts that JCI has violated the AOC in three ways:  1) by failing to submit

written quarterly progress reports; 2) failing to demonstrate environmental indicators; 3) failing

to submit an approvable corrective measures proposal.

1.    Quarterly Progress Reports

Saline asserts that JCI violated it obligations under paragraph 20(b) and 28(a) of the AOC

to submit written quarterly progress reports to the EPA.  Paragraph 20(b) of the AOC provides:

> b.    Johnson Controls must provide quarterly progress reports to U.S. EPA by
> the fifteenth day of the month after the end of each quarter.  The report
> must list work performed to date, data collected, problems encountered,
> project schedule, and percent of project completed.

(AOC at ¶ 20(b)).  Paragraph 28(a) provides:

> 28.  Johnson Controls must pay the following stipulated penalties to the United
> States for violations of this Order:

> a.    For failure to submit quarterly progress reports by the dates scheduled in
> paragraph 20, above: $1,000 per day for the first 14 days and $2,000 per
> day thereafter.

(AOC at ¶ 28(a)).

Saline asserts that JCI failed to submit eleven written Quarterly Progress Reports,

"spanning all of 2005, all of 2006, and the first three quarters of 2007."[5]  (Saline's Br. at 3).  For

this alleged violation of the AOC, Saline does not ask the Court to order any equitable relief.  For

example, Saline does not ask the Court to order JCI to submit written reports for these past time

---

[5]Thus, it is undisputed that JCI has been submitting written quarterly reports since the last
quarter of 2007.

14

periods.  Rather, Saline wants the Court to rule that JCI failed to comply with this requirement

under the AOC and order JCI to pay approximately 12 million dollars in stipulated penalties to

the U.S. Treasury.

JCI contends that there is nothing in the AOC that requires quarterly reports to be made in

writing.  It notes that Paragraph 20(b) simply states that JCI must "provide quarterly progress

reports" to the EPA at specified intervals.  JCI stresses that Paragraph 20(b) does not state that

those reports must be in writing, although other provisions in the AOC do specify that certain

actions must be in writing:

> Where JCI and EPA intended that reports or other materials should be in writing,
> they expressly said so.  See, e.g., AOC ¶¶ 9, 17, 20e, 20 g, 21, 23, 25, 29, 30, 38,
> 39, 40, 43, 44 and 45.  The parties did not, however, include the term "written" or
> "in writing" in AOC ¶20b.

(JCI's Resp. Br. at 6).

JCI further states that Saline has offered "no witness testimony, document or case law in

support of its argument that quarterly reports must be in writing."  (*Id.*).  JCI has offered evidence

to establish that a combination of verbal and written reporting under orders like the AOC is

common practice, including deposition testimony from William Muno, a retired 31-year veteran

of the EPA.  (*See* Muno Dep., Ex. 54, at 90-91).  JCI further explains:

> The evidence shows that JCI sometimes made written quarterly reports and at
> other times made verbal reports.  Verbal reports were more common during
> dormant periods, for example while JCI awaited EPA comments on a corrective
> measures proposal.  One such period occurred between May 2006 and March 15,
> 2007.  During this time no substantive Site work as itemized in AOC ¶20b was
> occurring at the Site, and thus no written report for such a period could make
> sense.  Nonetheless, in such cases JCI provided oral reports to the EPA, at least
> quarterly.  Later, when Site work was more active, EPA then requested that JCI
> submit written quarterly reports, which JCI did.  (Thomson Aff., Def. Ex. 1 ¶10;

Fenelon Aff., Def. Ex. 21 ¶¶5-6).

(JCI's Resp. Br. at 6).  JCI has offered evidence that it submitted verbal reports during the time periods in question.

The Court concludes that Saline cannot establish that JCI violated paragraph 20(b) of the AOC by failing to provide quarterly reports in writing.  Nothing within the four corners of the AOC requires quarterly reports to be in writing, although the AOC specifies that various other actions or reports must be in writing.

Accordingly, JCI did not violate paragraph 20(b) of the AOC by failing to submit written reports and JCI is therefore not subject to any stipulated penalties under paragraph 28(a) of the AOC.[6]

## 2.   Environmental Indicators Reporting

Saline further alleges that JCI violated Paragraph 13 of the AOC, which provides as follows:

> Johnson Controls must *demonstrate by February 1, 2004*, through *submitting an Environmental Indicators Report and by performing any other necessary activities*, consistent with this Section, that:

---

[6]In addition, even if the AOC did state that quarterly reports were to be provided in writing, this Court would not be inclined to order JCI to pay 12 million dollars in stipulated penalties for such a "technical" violation of the AOC.  In other words, even if JCI's providing verbal rather than written reports violated the actual terms of the AOC (which it does not), Saline has not shown that it was a material violation or that the failure to file a written report caused any harm.  For example, during a quarter when no substantive work was being done at the Facility, JCI verbally reported that status – rather than refiling the past written report and indicating no changes had occurred since the last report.  Providing a verbal report under such circumstances causes no harm and would not warrant imposing a penalty – especially given that the EPA never objected to receiving verbal rather than written reports.

     a.      All current human exposures to contamination at or from the facility *are under control*.  That is, significant or unacceptable exposures do not exist for all media known or reasonably suspected to be contaminated with hazardous wastes or hazardous constituents above risk-based levels, for which there are complete pathways between contamination and human receptors.

     b.      Migration of contaminated groundwater at or from the facility *is stabilized*. That is, the migration of all groundwater known or reasonably suspected to be contaminated with hazardous wastes or hazardous constituents above acceptable levels is stabilized to remain within any existing areas of contamination as defined by monitoring locations designated at the time of the demonstration.  In addition, any discharge of groundwater to surface water is either insignificant or currently acceptable according to an appropriate interim assessment.  Johnson Controls must collect monitoring and measurement data in the future as necessary to verify that migration of any contaminated groundwater is stabilized.

Johnson Controls may submit for U.S. EPA's review and comment, a draft of the Environmental Indicators Report, provided that such draft is submitted by October 1, 2003.

(AOC at ¶ 13) (emphasis added).  Paragraph 28 of the AOC sets forth stipulated penalties for

failing to comply with the above provisions:

28.     Johnson Controls must pay the following stipulated penalties to the United States for violations of this Order:

. . . .

     b.      For failure to adequately demonstrate that current human exposures are under control by February 1, 2004: $3,000 per day.

     c.      For failure to adequately demonstrate that groundwater migration is stabilized by February 1, 2004: $3,000 per day.

(AOC at ¶ 28).

The cross-motions indicate that the parties construe the above paragraph of the AOC

differently.

Saline construes Paragraph 13 as requiring JCI to not only submit an Environmental Indicators Report by February 1, 2004, but also to "demonstrate," by that same date, that human exposures to contamination are under control (a), and that migration of contaminated groundwater is stabilized (b). Saline alleges that JCI violated Paragraph 13 of the AOC because it did not adequately demonstrate that current human exposures are under control, or that groundwater migration is stabilized by, February 1, 2004. (*See* Saline's Br. at 5-7). Saline has submitted evidence in support of its allegation that JCI did not meet those alleged obligations by the stated deadline.

JCI reads Paragraph 13 differently. Focusing on the phrase "through submitting an Environmental Indicators report," and ignoring the remaining words "and by performing any other necessary activities," JCI takes the position that it met the above paragraph because it submitted a report before the deadline. JCI contends that the EPA then asked it for additional information, which it then provided by way of addendums.

The Court concludes that the obligations imposed by Paragraph 13 are unclear and that neither party has established that it is entitled to summary judgment as to this alleged violation of the AOC.

### 3.    Corrective Measures Proposal

Finally, Saline asserts that JCI has violated paragraph 15 of the AOC because it failed to submit an "approvable" corrective measures proposal. (*See* Saline's Br. at 12). Paragraph 15 of the AOC provides:

> Johnson Controls must *propose* to U.S. EPA by *May 1, 2004*, final corrective measures necessary to protect human health and the environment from all current and future unacceptable risks due to releases of hazardous waste or hazardous

18

constituents at or from the facility (the "Final Corrective Measures Proposal").
The proposal must describe all corrective measures implemented at the facility
since the effective date of this Order.  It must also include a description of all
other final corrective measures that Johnson Controls evaluated, a detailed
explanation of why Johnson Controls preferred the proposed final corrective
measures, and cost estimates for the final corrective measures evaluated.  The
proposal must also include a detailed schedule to construct and implement the
final corrective measures, and to submit a Final Remedy Construction Completion
Report.  Johnson Controls must complete as much of the initial construction work
as practicable within one year after U.S. EPA selects the final corrective
measures.  Johnson Controls must complete all final corrective measures within a
reasonable period of time to protect human health and the environment.

(AOC at ¶ 15) (emphasis added).

Saline states that JCI "submitted a Corrective Measures Proposal on June 15, 2004 (after
an approved 45 day extension."  (Saline's Br. at 12).  It then goes on to assert that the EPA
rejected it as inadequate and that other proposals have been submitted by JCI which have not
been approved.  Thus, Saline assert that JCI violated paragraph 15 of the AOC because it did not
submit a corrective measures proposal by May 1, 2004, that was "approvable" (i.e., ultimately
approved by the EPA).

Understandably, JCI asserts that Saline is adding terms into paragraph 15 of the AOC that
simply do not exist: "Plaintiff cites no witness testimony, document or case, or any section of the
AOC, in support of its argument that the term 'approvable' should be read into AOC ¶ 15, which
expressly states only that JCI propose corrective measures by a specified date, which Plaintiff
admits JCI did."  (JCI's Resp. Br. at 10). In support of its position, JCI directs the Court to a
February 17, 2005 letter from the EPA that states, in pertinent part:

In your letter, you expressed a concern that the terms of the AOC related to the
schedule of compliance have not been properly implemented.

19

> Specifically, we disagree with the statement in your letter that " . . . Johnson Controls is in violation of the Consent Order because it has failed to propose a final remedy in a timely fashion." It should be noted that JCI made the required submittals on the dates specified in the AOC. However, a 45-day extension was granted to JCI regarding the submittal of the proposed Final Corrective Measures document which was originally due on May 1, 2004. This extension was necessary to allow for completion of the interim corrective measures at the facility which consisted of the removal of PCB-contaminated soils. A corrective measures proposal was submitted by JCI on June 15, 2004.

(JCI's Ex. 11, D.E. No. 69-11).

The Court concludes that JCI is entitled to summary judgment with respect to Saline's allegation that JCI violated paragraph 15 of the AOC. Accordingly, JCI is not subject to any stipulated penalties for any violation of paragraph 15.

## B.    Saline's Request That The Court Order JCI To Pay Stipulated Penalties

Unless there is a violation of the AOC by JCI established, the Court need not consider whether to enforce any stipulated penalties provided for under the AOC for the alleged violations. Given the above rulings, the Court need not consider whether to order any stipulated penalties for the alleged violations of paragraphs 20(b) or 15.

If the Court ultimately determines that JCI violated the environmental indicators reporting provision, then the Court would have to determine whether to order that stipulated penalties for that violation of the AOC should be paid to the U.S. Treasury.

The Court believes it would therefore be premature to address JCI's various arguments in opposition to the imposition of such penalties at this time. (*See* JCI's Resp. Brief at 14-18).

III.    **Saline's Motion For Summary Judgment On JCI's Counterclaims Under CERCLA And NREPA**

JCI asserts the following counterclaims against Saline in Case No. 10-10507: "CERCLA § 107 Cost Recovery" (Count I); "CERCLA Declaratory Judgment" (Count II); "Cost Recovery – Michigan Natural Resources and Environmental Protection Act" (Count III); and "Declaratory Relief – NREPA" (Count IV).

Saline now challenges these environmental counterclaims, following the close of discovery, in a Motion for Summary Judgment.

"Broadly speaking, the Comprehensive Environmental Response, Compensation and Liability Act ('CERCLA'), 42 U.S.C. § 9601 *et seq*., facilitates cleanup and remediation of contaminated lands, and shifts the financial burden of such environmental response actions to the parties responsible for releasing hazardous substances." *ITT Industries, Inc. v. BorgWarner, Inc*., 506 F.3d 452, 456 (6th Cir. 2007). Michigan's Natural Resources and Environment Protection Act, M.C.L. § 324.3101 *et seq*., ("NREPA") was patterned after CERCLA and is construed in accordance with the federal statute. *City of Detroit v. Simon*, 247 F.3d 619, 630 (6th Cir. 2001).

Here, JCI asserts claims for cost recovery against Saline under both CERCLA and NREPA.

A.    **Can JCI Establish A Prima Facie Case For Cost Recovery Under §107(a) Of CERCLA?**

In order to establish a prima facie case for cost recovery under § 107(a) of CERCLA, a plaintiff must prove four elements: 1) the site is a "facility" within the statute's definition; 2) a release or threatened release of hazardous substance has occurred; 3) the release caused the plaintiff to incur "necessary costs of response"; and 4) the defendant falls within one of the four

21

categories of potentially responsible parties ("PRPs"). *Kalamazoo River Study Group v. Menasha Corp*., 228 F.3d 648, 653 (6th Cir. 2000); *Village of Milford v. K-H Holding Corp*., 390 F.3d 926, 933 (6th Cir. 2004).

In its motion, Saline does not challenge the first element. It does, however, challenge the remaining elements. That is, Saline contends that JCI cannot establish the second element (that a release or threatened release of hazardous substance occurred), the third element (that the release caused JCI to incur necessary costs of response), or the fourth element (that Saline is a PRP).

### 1.      Release

Saline asserts that JCI cannot prove that Saline caused a release or threatened release of hazardous substances at the Property. It contends that "JCI has not proven that [Saline] caused a 'release' of a hazardous substance into the environment, because the vinyl chloride was already in the soil and groundwater at that location, and there is no allegation that [Saline] brought additional vinyl chloride onto the site, much less spilled in [sic] on the ground at MW-2." (Saline's Br. at 6). Saline contends it has not "disposed" of any hazardous waste at the Property and submits an affidavit from Thomas Foley stating that. Saline further asserts:

> JCI contends that [Saline] exacerbated the existing environmental contamination below the building by allowing additional rainwater into the ground that the building and slab might have partially diverted to the slab perimeter. But this does not show that [Saline] released a hazardous substance into the environment.

(*Id*. at 6). Saline further asserts that "JCI alleges that [Saline] 'caused and contributed to the migration of hazardous substances at the Property by destroying the building slab, thus causing or contributing to the release of hazardous substances into the environment at the property.' JCI has not proven this, they have merely submitted testimony from GZA that speculates that the

22

temporary increase in existing vinyl chloride contamination for which JCI is liable under the

AOC must have been caused by the addition of rainwater through the broken concrete . . ." (*Id.*).

Thus, in sum, Saline asserts that: 1) a party does not cause a "release" under CERCLA when it

takes actions to exacerbate existing contamination at a site; and 2) JCI has not presented

sufficient evidence to create a genuine issue of fact as to this element.

In response, JCI asserts that it has submitted sufficient evidence to create a genuine issue

of fact as to whether Saline caused a "release" or "disposal."

The term "release" is broadly defined in the CERCLA statute as "any spilling, leaking,

pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or

disposing into the environment . . ."  42 U.S.C. § 9601(22); *see also Bob's Beverage, Inc. v.

Acme, Inc.*, 264 F.3d 692,696 n.2 (6th Cir. 2001).

"The term 'disposal' means the discharge, deposit, injection, dumping, spilling, leaking,

or placing of any solid waste or hazardous waste into or on any land or water so that such solid

waste or hazardous waste or any constituent thereof may enter the environment or be emitted into

the air or discharged into any waters, including ground waters."  42 U.S.C. § 6903(3).

The definition of release is broader than "disposal" because disposal is included within

the definition of release.  *United States v. 150 Acres of Land*, 204 F.3d 698, 706 (6th Cir. 2000).

"Although early CERCLA decisions interpreted 'disposal' to include passive movement of

substances (i.e., with no human activity)" later decisions have "limited 'disposal' to spills

occurring by human intervention.  Thus, passive migration of hazardous substances is not a

"disposal" under CERCLA.  *Id.* ("In the absence of any evidence that there was human activity

involved in whatever movement of hazardous substances occurred on the property since the

23

Bohatys have owned it, we hold that the Bohaty's have not 'disposed' of hazardous substances on the property.")  Even where there is no human activity involved in the movement of hazardous substances on a property, there can still be a "release." *Id.*

Here, more is alleged than just passive migration.  JCI alleges that Saline took the affirmative action of breaking up the concrete slab, which caused hazardous substances beneath that barrier to migrate into additional soils and groundwater.  JCI has presented evidence, and case law, to support its position.  (JCI's brief at 12-13).  The Court concludes that JCI has created a genuine issue of material fact as to whether Saline caused a release or disposal at the facility.

### 2.    Necessary Response Costs

In order to sustain a claim for cost recovery under CERCLA, JCI must have incurred "necessary costs of response," including costs of removal or remedial action.  *Ford Motor Co. v. Michigan Consolidated Gas Co.*, 2010 WL 3419502 (E.D. Mich. 2010).  "Most pertinent to this motion, costs of removal may include 'such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances.'  42 U.S.C. § 9601(23)."  *Id.* "Monitoring and evaluation costs may be recovered as 'removal' costs under CERCLA if they were reasonable, and the activities were not scientifically deficient or unduly costly."  *Village of Milford v. K-H Holding Corp*., 390 F.3d 926, 933 (6th Cir. 2004).

Saline contends that the additional monitoring performed at MW-2 was not caused by the demolition of the slab and subsequent rainwater infiltration.  Rather, it contends that the monitoring was simply done under the AOC.

JCI has presented sufficient evidence to create a genuine issue of fact as to whether the additional monitoring was a necessary response cost. (*See* Fenelon Affidavit).

24

3.      PRP

Under the statute, there are four categories of PRPs: 1) the current owner and operator of a facility; 2) any previous owner or operator during any time in which hazardous substances were disposed at a facility; 3) any person who arranged for disposal or treatment of hazardous substances at a facility; and 4) any person who transported hazardous substances to a waste facility.  42 U.S.C. § 9607(a)(1)-(4); *Centerior Service Co. v. Acme Scrap Iron & Metal*, 153 F.3d 344, 347 n.8 (6th Cir. 1998).

Here, JCI asserts that Saline is a PRP under both the first and second categories.  (*See* Counter-Complaint at ¶ 21).  It need only establish that it is a PRP under one of those two sections in order to state a prima facie case for cost recovery.

The Property is the facility at issue.  It is undisputed that Saline currently owns the Property. Thus, Saline is the current owner and operator of the facility under CERCLA.  Saline is therefore a PRP under § 9607(a)(1).

i.      **Has Saline Established That It Is Exempt From Liability Under The BFPP Exemption?**

A party who is a PRP under § 9607(a), however, may establish one or more statutory defenses.  Here, Saline asserts that it is exempt from liability under CERCLA's 'bona fide prospective purchaser" exception.  (*See* Saline's Br. at 10-11) (Saline "is a 'bona fide prospective purchaser' hence not a liable [sic] for contribution under CERCLA.")

Section 9607(r)(1) provides that certain bona fide prospective purchasers are exempt from liability:

> Notwithstanding subsection (a)(1) of this section, a bona fide prospective purchaser whose potential liability for a release or threatened release is based

solely on the purchaser's being considered to be an owner or operator of a facility shall not be liable as long as the bona fide prospective purchaser does not impede the performance of a response action or natural resource restoration.

42 U.S.C. § 9607(r)(1).  Thus, to be exempt under this provision, the PRP must: 1) meet the

definition of a bona fide prospective purchaser; and 2) not impede the performance of a response

action.  The term bona fide prospective purchaser is defined in § 9601 as follows:

(40) Bona fide prospective purchaser
  The term "bona fide prospective purchaser" means a person (or a tenant of a person) that acquires ownership of a facility after the date of the enactment of this paragraph and that *establishes each of the following by a preponderance of the evidence:*

(A) Disposal prior to acquisition
  All disposal of hazardous substances at the facility occurred before the person acquired the facility.
(B) Inquiries
    (I) In general
  The person made all appropriate inquires into the previous ownership and uses of the facility in accordance with generally accepted good commercial and customary standards and practices in accordance with clauses (ii) and (iii).

. . . .

(C) Notices
  The person provides all legally required notices with respect to the discovery or release of any hazardous substances at the facility.
(D) Care
  The person exercises appropriate care with respect to hazardous substances found at the facility by taking reasonable steps to –
    (I) stop any continuing release;
    (ii) prevent any threatened future release; and
    (iii) prevent or limit human, environmental, or natural resource exposure to any previously released hazardous substance.
(E) Cooperation, assistance, and access
  The person provides full cooperation, assistance, and access to persons that are authorized to conduct response actions or natural resource

26

restoration at a vessel or facility (including the cooperation and access necessary for the installation, integrity, operation, and maintenance of any complete or partial response actions or natural resource restoration at the vessel or facility).

(F) Institutional control

  The person –

> (I) is in compliance with any land use restrictions established or relied on in connection with the response action at a vessel or facility; and
> (ii) does not impede the effectiveness or integrity of any institutional control employed at the vessel or facility in connection with a response action.

(G) Requests; subpoenas

 The person complies with any request for information or administrative subpoena issued by the President under this chapter.

(H) No affiliation

 The person is not --

> (i) potentially liable, or affiliated with any person that is potentially liable, for response costs at a facility through --
>> (I) any direct or indirect familial relationship; or
>> (II) any contractual, corporate, or financial relationship (other than a contractual, corporate, or financial relationship that is created by the instruments by which title to the facility is conveyed or financed or by a contract for the sale of goods or services) or
> (ii) the result of a reorganization of a business entity that was potentially liable.

42 U.S.C. § 9601(40) (emphasis added).

Here, Saline has not even referenced the above essential elements of the defense – let alone presented evidence on each of the numerous elements.  In addition, even if it could establish that it meets all of the above elements, and therefore meets the statutory definition of a BFPP, Saline would still have to establish that it did not "impede the performance of a response action."  Given that it is undisputed that Saline broke up the concrete slab, and JCI's allegations regarding the impact of that action, there is a factual dispute as to that issue.  Thus, at this stage

of the litigation, Saline has not established this defense.

ii.     **Has Saline Established That It Is Entitled To The "Innocent Landowner Defense"?**

In arguing that it is exempt from liability under the BFPP provision, Saline appears to be confusing that statutory defense with CERCLA's "innocent landowner" defense, set forth in 42 U.S.C. §9607(b)(3).  (*See* Saline's opening brief at 10, asserting that it is exempted from liability as a "bona fide prospective purchaser," and its Reply Brief at 4-5, citing cases referencing innocent landowner exemption.)

Under the innocent landowner defense, an "otherwise liable facility owner or operator can escape liability by demonstrating that the release or threatened release was caused solely by an act or omission of a third party."  *Franklin County Conv. Fac. Auth. v. American Premier Underwriters, Inc.,* 240 F.3d 534, 547 (6th Cir. 2001).  "More specifically, CERCLA exempts an otherwise liable owner or operator from liability if he can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by:

> an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occur in connection with a contractual relationship, existing directly or indirectly, with the defendant . . . , if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions . . .

*Id.* at 547 n.5.

Saline has not established that it is exempt from liability under the innocent landowner

28

defense.  Although it briefs make some references to the defense, Saline has not actually asserted that it is entitled to this statutory defense or established that it is entitled to the defense.  This is especially so, given the evidence presented by JCI as to Saline's breaking up of the concrete slab on the Property.  Thus, Saline has not established the innocent landowner defense's requirement that it exercised due care with respect to the hazardous substance.

In sum, the Court concludes that: 1) JCI has established that Saline is a PRP for purposes of its prima facie case of cost recovery under CERCLA ; and 2) Saline has not established that it is entitled to either the BFPP defense or the innocent owner defense at this stage of the litigation. Accordingly, the Court shall deny Saline's request for summary judgment as to JCI's CERCLA counterclaims.

### B.    Can JCI Obtain Cost Recovery Under NREPA?

Saline also asserts that JCI has failed to demonstrate that it is a liable party under NREPA.  (*See* Saline's Br. at 10).

JCI asserts a counterclaim for cost recovery under NREPA.  (*See* Third Counterclaim in JCI's Counter-Complaint).  JCI alleges that Saline is a "responsible party" under M.C.L. § 324.20126(1)(a) as an "owner or operator of a facility if the owner or operator is responsible for an activity causing a release or threat of release"  (*See* Counter-Complaint at ¶ 35).  JCI also alleges that Saline is liable for response costs under M.C.L. § 324.20107a.

### 1.    Liability Under M.C.L. § 324.20126(1)(a)

Pursuant to § 324.20126(1)(a), the "owner or operator of a facility" can be liable "if the owner or operator is responsible for an activity causing a release or threat of release." To be liable, a defendant must have "caused" a release or threat of a hazardous substance, leading

29

to the incurrence of response costs, and the response costs must be "necessary." *Village of Milford*, 390 F.3d at 933 (citing M.C.L. § 324.20126)).

Because NREPA is CERCLA's counterpart, and is to be construed in accordance with the federal statute, this analysis is nearly identical to the above analysis as to whether there was a "release" that caused "necessary response costs" under CERCLA. For the reasons explained above, the Court concludes that JCI has established a genuine issue of material fact as to whether Saline can be found liable under § 324.20126(1)(a).

### 2.    Liability Under M.C.L. § 324.20107a

"Section 20107a sets forth the requirements for owners and operators who have knowledge that their property is a 'facility' with respect to hazardous substances. It requires owners to 'undertake measures as are necessary to prevent exacerbation of the existing contamination' and to 'undertak[e] response activity necessary to mitigate unacceptable exposure to hazardous substances [. . . ] and allow for the intended use of the facility in a manner that protects public health and safety.'" *Pactiv Corp. v. Chester*, 419 F.Supp.2d 956, 956 (E.D. Mich. 2006) (quoting M.C.L. § 324.20107(1)(a)). M.C.L. § 20107a(2) provides that, in addition to any other liability, a person who violates § 20107a(1) "is liable for response activity costs and natural resource damages attributable to any exacerbation of existing contamination and any fines or penalties imposed under this part resulting from the violation of subsection (1) but is not liable for performance of additional response activities unless the person is otherwise liable under this part for performance of additional response activities."

Thus, Saline could be found liable under M.C.L. § 324.20107a even if it is not liable under § 324.20126(1)(a).

30

Section 324.20107a(2) provides that the "burden of proof in a dispute as to what constitutes exacerbation shall be borne by the party seeking relief." *Id.*  The statute defines "exacerbation" as follows:

> "Exacerbation" means the occurrence of either of the following causes by an activity undertaken by the person who owns or operates the property, with respect to existing contamination:
> (i) Contamination that has migrated beyond the boundaries of the property which is the source of the release . . .
> (ii) A change in facility conditions that increases response activity costs.

M.C.L. § 324.20101(n).

JCI asserts that by breaking up the very large concrete slab on the Property that was serving as a barrier to the known contamination in the soil beneath the slab, Saline exacerbated the existing contamination by causing a change in facility conditions that increased response activity costs.  It therefore contends that it is able to seek response costs from Saline under the above section of the statute.  Thus, the question becomes whether JCI has submitted sufficient evidence to create a genuine issue of fact as to whether Saline's actions constitute exacerbation under the statute.  The Court concludes that it has.

On pages 2-6 of its Response Brief, JCI sets forth the evidence it believes establishes that Saline's actions constitute exacerbation.  JCI has presented evidence to show that:  1) there was a very large[7] concrete slab on the Property; 2) Saline knew there was contamination beneath the slab (Foley Dep. at 204-05); 3) a concrete slab can serve as an engineered barrier to contamination beneath the slab (Murray Dep. at 214-15); 4) Saline's environmental expert told

---

[7]The size of the slab is very large – 3 to 4 acres.  (*See* JCI's Resp. Br.); Foley Dep. at 198).  That is approximately 40 % of the total area of the Property.  (Foley Dep. at 198).

Saline representatives about their due care requirements, which were "first and foremost not to make the contamination worse, not to move it around, not to excavate it, not to create any new conditions of exposure for the existing contamination." (Murray Dep. at 206); 5) Saline's environmental expert advised Saline not to break up the slab and to leave it in place (Murray Dep. at 215-17); 6) Saline hired a contractor who broke up the slab (Foley Dep. at 198); 7) Saline has not undertaken any measures to prevent rainwater infiltration through the broken up building slab (Foley Dep. at 181); and 8) Saline's environmental expert prepared a "Due Care Plan" for Saline but, in breaking up the slab, Saline did not follow that plan (Murray Dep. at 219).

JCI's environmental consultant, Bernard Fenelon with GZA GeoEnvironmental, Inc. ("GZA"), signed an affidavit stating that removal of a barrier like the slab can "cause contamination underlying the barrier to migrate into additional soils and into groundwater causing a release of contamination and exacerbation of existing conditions." (Fenelon Affidavit at ¶ 7). Fenelon's Affidavit further states:

> Concentrations in groundwater of a volatile organic compound known as vinyl chloride at MW-2 more than doubled shortly after destruction of the floor slab and fluctuated thereafter in an unpredictable pattern but in some instances to an order of magnitude (10x) greater than the level that existed before break up of the slab. Before break up of the slab groundwater concentrations at MW-w had been stable for the prior 1 ½ years. GZA suspected that the reason for the increased concentrations was the infiltration of precipitation into subsurface soils through the broken up slab causing migration of previously stable contaminants. GZA acted in its professional judgment, with JCI's concurrence, to investigate the apparent exacerbation and threat of a continuing release by re-sampling MW-2 on more than the semi-annual monitoring basis done under the AOC. GZA decided, accordingly, to conduct an extra round of sampling at MW-2 which occurred on December 9, 2009, at JCI's cost. But for the spiking of groundwater concentrations following break-u; of the slab, this response cost would not have

32

been necessary under the AOC.

(Fenelon Affidavit at ¶ 12).  Fenelon's Affidavit attaches a summary, stating that the extra

monitoring cost JCI a total of $5,600.  (Fenelon Affidavit, Ex. B).

Thus, the Court concludes that JCI has submitted sufficient evidence to create a genuine

issue of material fact as to whether Saline's actions constitute exacerbation under M.C.L. §

324.20107a.

### 3.      Other Arguments As To Liability Under NREPA

As it did in it previous Motion to Dismiss, Saline argues that it is exempt from liability

under M.C.L. § 324.20126(1)(c) because it conducted an appropriate baseline environmental

assessment.  (*See* Saline's Br. at 11).  As explained above, however, M.C.L. § 324.20107a

provides that a party that exacerbates existing contamination can still be liable for response costs.

Even if Saline conducted an appropriate baseline environmental assessment before it purchased

the property, JCI can still obtain response costs from Saline if it can establish that Saline

exacerbated the existing contamination.

Saline also asserts that "Section 20128 of Part 201 of NREPA expressly prohibits claims

for indemnification or contribution and claims for loss or damages or economic loss, unless

caused by conduct of the response activity contractor that is negligent, grossly negligent, or that

constitutes intentional misconduct.  MSA 324.20128.  JCI's counterclaims do not included [sic]

allegations of negligence, gross negligence, or intentional misconduct."  (Saline's Br. at 12).

M.C.L. § 324.20128, however, governs claims asserted against "response activity contractors."

Saline has not established that it meets the statutory definition of "response activity contractor."

Saline asserts that it is "akin" to a response activity contractor, and suggests that it should be

treated as if it were a response activity contractor, but offers no authority to support that assertion.  Thus, Saline has not established that this section applies to it or prohibits JCI from seeking cost recovery from it under NREPA.

Accordingly, the Court shall deny Saline's Motion for Summary Judgment on JCI's Counterclaims (D.E. No. 81).

## CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that JCI's Motion to Dismiss Plaintiff's Amended Complaint is GRANTED and Saline's state-law claims of breach of contract, nuisance and negligence are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that Saline's Motion for Summary Judgment as to its citizen suit to enforce the AOC is DENIED.

IT IS FURTHER ORDERED that JCI's cross-motion for summary judgment as to Saline's citizen suit to enforce the AOC is GRANTED IN PART.  The motion is GRANTED to the extent that the Court rules that JCI is entitled to summary judgment with respect to Saline's claims that JCI violated paragraph 20(b) of the AOC, and its claim that JCI violated paragraph 15 of the AOC.

IT IS FURTHER ORDERED that Saline's Motion for Summary Judgment on JCI's Counterclaims is DENIED.

Accordingly, the following claims remain in this action: 1) Saline's citizen suit to enforce the AOC, for the sole claim that JCI violated paragraph 13 of the AOC; and 2) JCI's

counterclaims under CERCLA and NREPA.

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  October 17, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record on October 17, 2011, by electronic and/or ordinary mail.

S/Jennifer Hernandez
Case Manager

35