UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Saline River Properties, LLC,
a Michigan limited liability company,

       Plaintiff,

v.                                     Case No. 10-10507

Johnson Controls, Inc., a Wisconsin        Honorable Sean F. Cox
corporation,

       Defendant;

-and-

Johnson Controls, Inc., a Wisconsin
corporation,

       Counter-Plaintiff,

v.

Saline River Properties, LLC,
a Michigan limited liability company,

       Counter-Defendant.

_____/

## **OPINION & ORDER**

      This dispute arises out of property located in Saline, Michigan ("the Property") and

currently owned by Saline River Properties, LLC. ("SRP"). Hoover Universal Inc. ("Hoover"),

which was eventually acquired by Johnson Controls, Inc. ("JCI"), once operated a metal

fabrication on the Property. In 2003, JCI consented to an Administrative Order on Consent

("AOC") by the United States Environmental Protection Agency ("EPA."), which: 1) requires

1

JCI to take various environmental remedial actions by specified dates; and 2) provides stipulated penalties for failing to do so.  SRP has brought a citizen suit to enforce the AOC, pursuant to § 6972(a)(1)(A) of the Resource Conservation and Recovery Act ("RCRA").  JCI has brought a counterclaim alleging that it is entitled to the recovery of costs it incurred while responding to certain actions by SRP that have caused a release or threat of release of hazardous substances on the property.

For the reasons that follow, which constitute the findings of fact and conclusions of law required by Fed. R. Civ. P. 52, the Court finds JCI not liable for alleged violations of paragraph 13 of the AOC.

The Court also finds that SRP is liable to JCI for damages in the amount of $1,200.00 for the recovery of response costs resulting from the threat of release of hazardous substances. Finally, the Court finds that SRP is not liable for future response costs incurred by JCI that resulted from the release of hazardous substances.

**Background**

On February 4, 2010, SRP filed Case No. 10-10507, asserting the following five counts: "Citizen Suit to Enforce EPA Order" (Count I); "Breach of Contract" (Count II); "Negligence and Negligence Per Se" (Count III); "Nuisance" (Count IV); and "Tortious Interference" (Count V).

On March 16, 2010, JCI filed a Motion to Dismiss.  (D.E. No. 10).[1]  In an Opinion & Order issued on June 25, 2010, this Court denied JCI's Motion to Dismiss as to Count I, the only

---

[1]All docket entry citations refer to docket entries filed under Case No. 10-10507 unless specified otherwise.

federal count asserted, and dismissed SRP's state-law claims without prejudice because it declined to exercise supplemental jurisdiction over those state-law claims.  (D.E. No. 14).

Thereafter, SRP filed a First Amended Complaint (D.E. No. 28), which is its operative complaint in Case No. 10-10507 and it asserts just one count – a citizen suit to enforce the AOC.

JCI asserts the following counterclaims against SRP in Case No. 10-10507: "CERCLA § 107 Cost Recovery" (Count I); "CERCLA Declaratory Judgment" (Count II); "Cost Recovery – Michigan Natural Resources and Environmental Protection Act" (Count III); and "Declaratory Relief – NREPA" (Count IV).[2]

After this Court issued its June 25, 2010 Opinion & Order declining to exercise supplemental jurisdiction over SRP's state-law claims, SRP filed an action in state court against JCI.  In that state-court action, SRP asserted breach of contract, nuisance, and negligence claims against JCI.  JCI removed the action on August 25, 2010, based upon diversity jurisdiction.  That action was styled as Case No. 10-13406 and was assigned to the Honorable Lawrence P. Zatkoff.

On September 20, 2010, JCI filed a Motion To Dismiss Plaintiff's Complaint in Case No. 10-13406.  (D.E. No. 6, Case No. 10-13406).

On October 11, 2010, SRP filed an Amended Complaint in Case No. 10-13406 (D.E. No. 10, Case No. 10-13406) and a Response to JCI's Motion to Dismiss.  (D.E. No. 9, Case No. 10-13406).  SRP's First Amended Complaint asserts the following counts: "Breach of Contract" (Count I); "Nuisance" (Count II); "Negligence" "(Alternative to Count I)" (Count III).

Case No. 10-13406 was reassigned to this Court as a companion case on January 5, 2011.

---

[2]After JCI asserted those counterclaims, SRP filed a motion to dismiss the counterclaims, which was denied by this Court in its entirety.  (D.E. No. 46).

(D.E. No. 20, Case No. 10-13406).  On February 24, 2011, this Court consolidated Case No. 10-10507 with Case No. 10-13406 for pretrial purposes.  (D.E. No. 39).

In addition to this Court's June 25, 2010 Opinion & Order, this Court issued another Opinion & Order on October 17, 2011, regarding multiple dispositive motions filed by both parties.  As a result of the Court's rulings in those orders, only the following claims remain: 1) SRP's citizen suit to enforce the AOC, for the sole claim that JCI violated paragraph 13 of the AOC; and 2) JCI's counterclaims under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") and Michigan's National Resource and Environmental Protection Act ("NREPA").

A Joint Final Pretrial Order was filed on December 8, 2011.  (D.E. No. 114).  The case was tried to the bench over the following days: June 18, 2012, through June 22, 2012; and June 25, 2012 through June 27, 2012.

## The Trial

A. <u>Exhibits:</u>

The parties presented to the Court multiple exhibit books and a joint exhibit list.  SRP's exhibits were marked A through E-11, and JCI's exhibits were marked DX-1 through DX-64.  Although not all exhibits listed in the parties' joint exhibit list were admitted as evidence during trial, those exhibits that were admitted were introduced without objection.  The exhibits presented to the Court included, but were not limited to, the AOC, documents submitted on behalf of JCI pursuant to the AOC, correspondence between the parties, and photographs of the facility and Property.[3]

_____

[3]*See* 6/27/2012 Trial Transcript at 71-72 for a complete list of admitted exhibits.

B.     Witnesses:

SRP presented its proofs through three witnesses: Patricia Thomson ("Thomson"), John

Osborne ("Osborne"), and Brett Shoaff ("Shoaff").

JCI presented its proofs through Thomson, Osborne, and Shoaff, and two additional

witnesses: Douglas McClure ("McClure") and William Muno ("Muno").

**Findings of Fact[4]**

After consideration of the facts stipulated by the parties and consideration of the

testimony and exhibits presented at trial, drawing inferences as appropriate, weighing the

evidence and assessing the credibility of the witnesses, the Court finds as follows.

The Property:

The Property is known as the former Washtenaw Industrial Facility and is located at 232

and 290 Monroe Street, Saline, Michigan.  The Property also includes a parcel located at 237

Monroe Street, Saline, Michigan.

The 232 Monroe parcel is approximately 9.94 acres in size and is situated at the west side

of Monroe Street.  Hoover operated a metal fabrication, plating, and polishing facility on the 232

Monroe parcel from the mid-1940s until 1985.  The actual manufacturing building (the

"Building") was 141,000 square feet, sat atop a concrete slab, and was surrounded by soil and

gravel-covered land.  In 1985, the site underwent a RCRA closure under the guidance of the EPA

and the Michigan Department of Environmental Quality ("MDEQ").

The 290 Monroe parcel is located south of the Saline River and is approximately 3.59

---

[4]To the extent that a finding of fact is more properly a conclusion of law, and to the extent
that a conclusion of law is more properly a finding of fact, it should be so construed.

5

acres in size.  It was used as a surface impoundment to store residual material from the treatment

of wastewater associated with the manufacturing operations at the 232 Monroe Facility.  No

manufacturing operations were conducted at the 290 Monroe parcel.  In 2002, the 290 Monroe

parcel underwent remediation pursuant to Part 201 of NREPA, which is commonly referred to

Michigan's Part 201.[5]

The 237 Monroe parcel is the parcel easterly adjacent to 232 Monroe and is

approximately 1.36 acres in size.  The 237 Monroe parcel was previously used as a city landfill.

This use was unrelated to Hoover's manufacturing operations on the 232 Monroe parcel.  The

237 Monroe parcel was most recently used as a parking lot.

The combined size of the 232, 290, and 237 parcels is approximately 14.89 acres.[6]  The

land is contoured such that groundwater flows from the north toward the Saline River.  (*See*

Exhibit DX-64, EI Report, Figure 2).

Together, the 232, 290, and 237 Monroe parcels are considered the "Facility."  The

Property was cleaned up and closed prior to the issuance of the AOC.  At the time JCI submitted

its Environment Indicators Report, discussed *infra*, the Property was zoned for industrial use and

was completely fenced and locked.

The Parties:

JCI acquired Hoover via a merger and is considered the former owner and operator of the

---

[5]*See* M.C.L. § 324.20101, *et seq.*

[6]The AOC describes the Facility as consisting of 22 acres.  This approximation, however, erroneously includes two parcels located at 247 Monroe and 289 Monroe.  The EPA did not actually consider the 247 and 289 Monroe parcels as part of the Facility at the time the AOC was executed.

Facility under RCRA.  JCI has assumed all responsibilities and obligations under the AOC at issue in this action.  The AOC provides, "No change in ownership or corporate or partnership status relating to the facility will alter [JCI's] obligations under this Order."  (AOC at ¶7).

SRP purchased the Property from a third-party bank in 2006 and is the current owner of the Property.  SRP purchased the property with the intention of developing a seven-building, residential complex containing 102 condominium units.

The Administrative Order on Consent:

JCI and the EPA entered into an Administrative Order on Consent, pursuant to Section 2008(h) of RCRA, with an effective date of September 19, 2003.  Dennis Reis, JCI's environmental counsel, represented JCI during the negotiation phase of the AOC.  Under the terms of the AOC, JCI is responsible and liable for any violations of the AOC.  (*See* AOC at ¶6).

Section VI of the AOC, titled "Work to be Performed," consists of paragraphs 10 through 21 of the AOC.  At issue in this case is whether JCI complied with the requirements of paragraph 13 of the AOC.  Paragraph 13 provides:

> Johnson Controls must demonstrate by February 1, 2004, through submitting an Environmental Indicators Report and by performing any other necessary activities, consistent with this Section, that:
>
> a.   All current human exposures to contamination at or from the facility are under control.  That is, significant or unacceptable exposures do not exist ***for all media known or reasonably suspected to be contaminated*** with hazardous wastes or hazardous constituents above risk-based levels, for which there are complete pathways between contamination and human receptors.
>
> b.   Migration of contaminated groundwater at or from the facility is stabilized.  That is, the migration of all groundwater ***known or reasonably suspected to be contaminated*** with hazardous wastes or hazardous constituents above acceptable levels is stabilized to remain

> within any existing areas of contamination as defined by monitoring locations designated at the time of the demonstration. In addition, any discharge of groundwater to surface water is ***either insignificant*** or ***currently acceptable*** according to an appropriate interim assessment. ***Johnson Controls must collect monitoring and measurement data in the future as necessary to verify that migration of any contaminated groundwater is stabilized***.

Johnson Controls may submit for U.S. EPA's review and comment, a draft of the Environmental Indicators Report, provided that such draft is submitted by October 1, 2003.

(AOC at ¶ 13) (emphasis added). Paragraph 13 requires JCI to perform "any other necessary activities, consistent with this Section." Some of those necessary activities are described in paragraph 11(b), which requires JCI to:

> Perform an investigation to identify the nature and extent of any releases of hazardous waste or hazardous constituents at or from the facility which may pose an unacceptable risk to human health and the environment, and provide a report to U.S. EPA. The report must also describe the nature and extent of any releases of hazardous waste and hazardous constituents at or from the facility which do not pose an unacceptable risk to human health and the environment, and provide the basis for those conclusions, including an evaluation of the risks. Johnson Controls may prepare and submit the report in two phases to provide timely support for the demonstrations in paragraph 13, below, and for the determinations and proposal described in paragraph 15, below.

(AOC at ¶ 11(b)).

Additionally, paragraph 14 of the AOC enumerates certain obligations that JCI must meet in order to adequately comply with paragraph 13. Paragraph 14 provides:

> To prepare for and provide the demonstrations required by paragraph 13, above, Johnson Controls must:
>
> a.    Determine appropriate risk screening criteria under ***current use scenarios*** and provide the basis and justification for the use of these criteria.
>
> b.    Determine any current unacceptable risks to human health and the

environment and describe why other identified risks are acceptable.

c.      Control any unacceptable current human exposures that Johnson Controls identifies.  This includes performing any corrective actions or other response measures ("corrective measures") necessary to control current human exposures to contamination to within acceptable risk levels.

d.      Stabilize the migration of groundwater.  This includes implementing any corrective measures necessary to stabilize the migration of contaminated groundwater.

e.      Conduct groundwater monitoring to confirm that any contaminated groundwater remains within the original area of contamination.

f.      Prepare a report, either prior to or as part of the final Environmental Indicators Report, that describes and justifies any interim actions performed to meet the requirements of this Section, including sampling documentation, construction completion documentation and/or confirmatory sampling results.

(AOC at ¶14) (emphasis added).

Although paragraph 14 provides some guidance as to JCI's obligations under paragraph 13, the specific actions necessary to comply with paragraph 13, such as determining where to take soil and groundwater samples, are left to the discretion of the professional conducting the environmental investigation.

In paragraph 28, the AOC provides for stipulated penalties specific to violations of paragraph 13.  Paragraph 28 provides:

Johnson Controls must pay the following stipulated penalties to the United States for violations of this Order:

* * *

b.      For failure to adequately demonstrate that current human exposures are under control by February 1, 2004: $3,000 per day

9

    c.      For failure to adequately demonstrate that groundwater migration is stabilized by February 1, 2004: $3,000 per day. . .

(AOC at ¶ 28).  Paragraph 29 further provides that "[f]or items b and c, above, stipulated penalties will not accrue during the period, if any, beginning 31 days after the Final Environmental Indicators Report is due until the date that U.S. EPA notifies Johnson Controls in writing of any deficiency in the required demonstration(s)."  (AOC at ¶ 29).  Additionally, paragraph 30 states that "Johnson Controls must pay any stipulated penalties owed to the United States under this Section within 30 days of receiving U.S. EPA's written demand to pay the penalties. . . ." (AOC at ¶ 30).

To date, JCI has never received a written demand from the EPA to pay stipulated penalties pursuant to paragraph 28.

<u>The Witnesses:</u>

Thomson is a Senior Regulatory Technical Specialist with Entact, LLC ("Entact"), which contracted with JCI to investigate the Property and perform work in relation to the AOC. Beginning in 2003, Thomson was intimately involved in the environmental field investigation of the Property and the drafting of various reports submitted to the EPA pursuant to the AOC. Thomson testified extensively regarding the field investigation performed by Entact, the reports drafted by Entact for submission to the EPA, and the communications between Entact and agents of the EPA.

Osborne is the Principal and District Office Manager of GZA Environmental ("GZA"). In January 2007, GZA contracted with JCI to replace Entact as JCI's environmental consultants assigned to investigate the Property.  Osborne was also intimately involved in the field

investigation of the Property and the submission of reports to the EPA.  Like Thomson, Osborne testified extensively regarding the field investigation performed by GZA, the reports drafted by GZA for submission to the EPA, various remedial measures conducted by GZA, and the communications between GZA and agents of the EPA.

Shoaff was a Senior Project Manager and Senior Geologist for Canopus Environmental Group ("Canopus") from May 2005 through May 2011.  Canopus contracted with SRP in 2004 to investigate the Property in anticipation of SRP's purchase of the Property.  Shoaff was specifically tasked with evaluating Brownsfields options for residential development on the Property in order to determine potential funding sources.  As part of Shoaff's work, he reviewed reports that had been generated by Entact regarding the environmental conditions of the Property. Shoaff testified about various environmental site investigation processes and Canopus' investigations of the Property on behalf of SRP.  Shoaff also testified as to the opinions he formed during the course of his investigation regarding the adequacy of Entact's demonstrations under paragraph 13 of the AOC.

McClure has represented SRP as counsel during the course of this litigation.  Prior to the filing of the instant action, McClure also represented SRP in its dealings with various governmental authorities, including the EPA and the Washtenaw County Brownsfields Redevelopment Authority, to obtain Brownsfields funding with respect to the Property.  McClure testified regarding his communications with representatives of the Washtenaw County Brownsfields Redevelopment Authority, agents of SRP, and Schoaff during the fall of 2007. McClure also testified regarding his conversations with JCI's environmental counsel.

Muno is the owner of an environmental consulting firm called Environmental Consulting

11

and Management.  Muno previously worked for the EPA from 1973 to 2004, and served as the

Senior Executive of the RCRA Waste Management Division, which oversaw overall

responsibilities for RCRA and the Superfund.  Muno also served as the EPA's Chief of RCRA

Enforcement for six years.  Muno testified regarding his extensive experience with RCRA

enforcement actions and the reasonableness of the amount of stipulated monetary penalties that

SRP has requested the Court order against JCI.

Entact's Investigation and JCI's Submission of the Environmental Indicators Report:

In 2002, Entact began preliminarily investigating the 290 Monroe parcel on behalf of JCI.

Thomson's involvement with Entact's investigation of the Property began in November 2002.

On November 13, 2002, Thomson sent a Freedom of Information Act ("FOIA") request to the

MDEQ, the EPA, the Department of Public Health, and a private electronic regulatory database

company.  Thomson sent the FOIA requests in an effort to gather background records from

regulatory agencies about the historical operations and cleanup of the Property.  In addition to

various records obtained through her FOIA requests regarding the Property, Thomson reviewed

two environmental reports drafted in 1998 and 2002 by NTH Consultants ("NTH"), which was

the environmental consultant for various third-parties. Thomson also reviewed a draft of the

AOC that would later take effect on September 19, 2003.

On January 8, 2003, Entact entered into a contract with JCI to generate a Current

Conditions Report, conduct a field investigation, generate an Environmental Indicators Report,

and generate a Final Corrective Measures Proposal consistent with the requirements of the AOC.

(Exhibit DX-44, Entact Contract).

In February of 2003, Entact, on behalf of JCI, submitted to the EPA a Current Conditions

Report ("CCR") in accordance with the AOC.  (Exhibit DX-33, CCR).  The CCR was prepared

by Thomson.  The purpose of the CCR was to summarize previous regulatory actions and

environmental testing results, and to "identify residual constituents of concern that need to be

addressed based on *future industrial land use.*"  (CCR at ¶1.1) (emphasis added).  The CCR

noted that environmental investigations conducted by NTH revealed hazardous waste or

hazardous constituents present at the Facility and "[t]here is or has been a release of hazardous

constituents into the environment from the facility during the time that JCI owned or operated the

facility."  (CCR at ¶1.5).

After submission of the CCR to the EPA, JCI proceeded with its field investigation of the

Facility.  In addition to the groundwater monitoring wells installed by NTH on the 290 Monroe

parcel, JCI installed multiple groundwater monitoring wells on the 232 Monroe parcel.  Most of

the monitoring wells on the 232 Monroe parcel were installed to the south of the Building.  One

monitoring well was installed north of the Building.  (*See* CCR, Figure 3).  JCI also took multiple

soil samples from land surrounding the Building and along the banks of the Saline River.  (*See* EI

Report, Figure 4).

In accordance with paragraph 13 of the AOC, JCI submitted a draft Environmental

Indicators Report to the EPA.  On December 19, 2003, Juana Rojo, a Corrective Action Project

Manager with the EPA, provided comments to the draft EI Report.  (Exhibit X-3, 12/19/2003

EPA Comments).  With respect to the 237 Monroe parcel, which is identified as the eastern

adjacent property, the EPA explained, "The Environmental Indicators report and any future

investigative report for the 232/290 sites should discuss in detail this area and provide a

description of any plans for further (*or non-further*) actions for this area, including investigative

13

and/or remedial plans if applicable." (*Id*. at ¶ 1) (emphasis added). The comments also directed JCI to conduct confirmatory soil sampling in the areas surrounding the surface impoundments located on the 290 Monroe parcel. (*Id*. at ¶ 4).

On February 1, 2004, Entact submitted to the EPA an Environmental Indicators Report (the "EI Report") on behalf of JCI. (Exhibit DX, EI Report). At the time JCI submitted its EI Report, the Building on the 232 Monroe parcel was still standing. The EI Report provided, "the future land use for the 232 Monroe Property will remain industrial for evaluation purposes." (*Id*. at 32). The EI Report discussed the results of Entact's field investigation. The EI Report included a demonstration that significant or unacceptable current human exposures to contamination above risk-based levels for which there was a complete pathway between the contamination and human receptors were under control. The EI Report also included a demonstration that migration of groundwater known or reasonably known to be contaminated with hazardous wastes or hazardous constituents above acceptable levels was stabilized.

In addition to the EI Report, the EPA required JCI to submit Environmental Indicator Determination Forms CA 725 and CA 750. (*See* EI Report, Appendix G). Form CA 725 indicates whether current human exposures are under control, and Form CA 750 indicates whether migration of contaminated groundwater is under control. (*Id*.). Both forms state that the "Current Human Exposures Under Control" environmental indicators are "for reasonably expected human exposures under current land- and groundwater-use conditions ONLY and do not consider potential future land- or groundwater-use conditions or ecological receptors." (*Id*.).

On February 26, 2004, Rojo, on behalf of the EPA, sent a letter to Thomson acknowledging that the EPA completed its review of the EI Report. (2/26/2004 EPA Comments,

14

Exhibit C-4).  In the letter, the EPA stated that the information provided to the EPA indicated that the 237 Monroe parcel had been previously used as a city dump.  (*Id*. at 1)  The EPA stated that the 237 Monroe parcel is an Area of Concern[7] and the risk to workers of soil and groundwater contaminants should be considered in the risk analysis for justification of future land use.  (*Id*.).  The EPA also stated that laboratory equipment stored in the Building's boiler room by previous tenants was also an Area of Concern and requested that JCI address the laboratory and its potential for environmental concern in documents supporting the EI Report.  (*Id*.).  Finally, the EPA directed JCI include volatile organic compounds ("VOCs") to its list of groundwater sampling parameters for future groundwater sampling on the 290 Monroe parcel.  (*Id*. at 2).

On June 15, 2004, JCI submitted to the EPA an addendum to the EI Report.  The addendum included data from additional groundwater samples and updated the CA 725 and CA 750 forms to include PCB removals.

On September 30, 2004, Thomson emailed Rojo and inquired about the status of the addendum to the EI Report.  Rojo responded, "*The EI is acceptable*.  There will be additional comments about the lab area, though (from the point of view of completion of corrective actions).  Also, some degree of groundwater monitoring will be necessary either now or as part of institutional controls."  (Exhibit DX-11, 9/30/2004 email) (emphasis added).

In a letter addressed to Thomson and dated November 9, 2004, Rojo, on behalf of the EPA, provided JCI with comments regarding JCI's June 15, 2004 addendum to the EI Report.

---

[7]In the context of environmental indicators, an "Area of Concern" is a term of art used by environmental experts to describe a specific area that the EPA believes needs to be addressed in an environmental indicators report. (6/18/2012 Trial Transcript at 90).

(Exhibit Q-4, 11/9/2004 EPA Comments).  In the letter, the EPA directed JCI to conduct

additional groundwater sampling on the Property and to submit additional information about the

laboratory in order to make a decision regarding the completion of corrective action

requirements.  (*Id*. at 2-3).  Additionally, the EPA stated:

> Based on the information provided by ENTACT to support the Environmental
> Indicators (EI) determination for the Washtenaw facility, it would appear that,
> currently, the contaminants present in the easterly adjacent property do not pose an
> exposure risk to human health and the environment.  The U.S. EPA has not required
> additional sampling for this area.  However, if the soil data is questionable, as
> indicated by Johnson Controls, Inc. (JCI) in the Addendum. . . then JCI should
> conduct confirmatory sampling at this property.

(*Id*. at 1).  As a result, Entact conducted additional groundwater sampling in 2005 at the request

of the EPA.

SRP's Purchase of the Property and Canopus' Investigations:

In 2004, prior to its purchase of the Property, SRP hired Canopus to evaluate Brownsfield

funding options for the Property.

In 2006, Brett Shoaff was tasked with generating a Baseline Environmental Assessment

("BEA") for submission to the EPA.  (Exhibit 5, BEA).  A BEA is a document that prospective

property purchasers prepare in order to establish liability protection.  In February of 2005, in

preparation for generating the BEA, Canopus conducted a subsurface investigation of the

Property to "further evaluate soil and groundwater quality within the footprint of the existing on-

site manufacturing building, including the location of a suspect former parts plating area that was

not investigated previously, and in certain areas proximal to known contamination previously

identified at the site."  (BEA at 3).  During the course of its investigation, Canopus found

additional groundwater contamination underneath the Building and in areas surrounding the

Building.

On November 22, 2005, Rojo sent a letter to Thomson indicating that the investigation conducted by Canopus revealed that groundwater contaminates exceeded Part 201 residential drinking water criteria in an area underneath the Building and an area south of the Building near a storm water outfall. (Exhibit E-5, 11/22/2005 EPA letter). The EPA requested that JCI further investigate these areas. (*Id.*).

In March of 2006, SRP purchased the Property with the intention of developing it for residential use. (BEA at 3). Soon after SRP's purchase of the Property, the Property was rezoned for residential use. Canopus completed the BEA on May 8, 2006, and submitted it to the MDEQ on October 16, 2006.

Also in May 2006, Entact, on behalf of JCI, submitted a Final Corrective Measures Proposal ("CMP") to the EPA. (Exhibit DX-17, CMP). The CMP summarized removal actions and investigation results conducted by JCI in 2005 and provided a summary of current conditions on the Property. The CMP also provided an evaluation and comparison of alternative corrective measures. One of the corrective measures proposed by JCI in the CMP was to maintain the concrete floor slab of the Building as an engineered barrier in order to achieve "effective long-term protection of human health and the environment at the site. . . ." (CMP at 30).

In December 2006, Canopus conducted another subsurface investigation. (Exhibit T-6, Phase II Report). Canopus conducted additional soil and groundwater sampling. Because the Property had been rezoned residential use, Canopus investigated the conditions underneath the Building, which were not previously investigated by JCI. Canopus found volatile organic compounds ("VOCs") in the soil underneath the Building.

17

Canopus also reviewed a photograph of a geotechnical boring that was drilled at the western portion of the 232 Monroe parcel by a third party during an unrelated geotechnical investigation in 2006.  Canopus observed an oily sludge material coming out from the boring. (Exhibit X-4, Photo of Boring B-8).  After digging a test pit in the area of the boring, Canopus discovered layered plating waste.  From its investigation of the boring, Canopus determined that the specific area of the 232 Monroe parcel surrounding the boring was used as an impoundment for plating waste.  During the test pitting, Canopus also removed a portion of the concrete floor slab of the Building and discovered a pipeline that appeared to lead into to the impoundment area.

At some point during Canopus' 2006 investigation, JCI demolished the Building, leaving only the Building's concrete floor slab in place.  During the demolition process, Canopus also discovered a sub-grade concrete vault containing water and sludge in the northeast portion of the Building.  (Phase II Report at 10).

Canopus summarized its findings of its December 2006 investigation in a report titled "Phase II Subsurface Investigation Report."  Canopus submitted the report to the MDEQ on March 6, 2007.  The EPA also reviewed the report, and, in a letter dated March 15, 2007, the EPA instructed JCI and Entact to re-evaluate and revise its CMP to account for the findings of Canopus.  The EPA also instructed JCI to revise its proposed corrective measures to account for the residential rezoning of the Property.  The EPA further instructed JCI to submit revised EI determinations. (Exhibit V-6, 3/15/2007 EPA letter).

GZA's Investigation:

In 2007, JCI replaced Entact as its environmental consultant for the Property with GZA.

18

Geologist John Osborne, of GZA, was the Principal in Charge of the Washtenaw Industrial Facility project.

On June 4, 2007, GZA generated a work plan in order to further characterize[8] the Property and incorporate the findings of Canopus into a single plan.  The work plan included further investigation of the newly-discovered surface impoundment, soil on the southwest portion of the site near the Saline River, the concrete vault, the 237 Monroe parcel, soil underneath and around the concrete slab, and groundwater through the central portion of the Property.

In August 2007, GZA, on behalf of JCI, submitted updated and revised environmental indicator forms CA 725 and CA 750.  (Exhibits K-7 & L-7, 2007 EI Forms).

GZA then conducted various interim actions in order to advance the Property toward RCRA closure.  These interim actions included the excavation of the surface impoundment area and removal of the concrete vault.  On behalf of JCI, GZA summarized these interim actions in an Interim Action Report ("IAR") and submitted the IAR to the EPA on December 12, 2008. (Exhibit N-8, IAR).

To date, the EPA has never sent JCI a notice of a breach of the AOC, or a written demand to pay penalties.

SRP's Demolition of the Concrete Floor Slab:

In April 2007, SRP demolished the concrete floor slab that covered approximately 3 acres of land at the 232 Monroe parcel.  As stated in its May 2006 CMP, JCI proposed to use the concrete floor slab as an engineered barrier to prevent rainwater from making contact with the

---

[8]To characterize a site is to utilize environmental investigations to understand the nature and distribution of impacts at the property.  (6/20/2012 Trial Transcript at 80).

known contaminated soil underneath.

After SRP broke up the slab and during the course of JCI's regular groundwater monitoring, JCI recorded a rise in VOCs in one of the monitoring wells installed in the area where the slab previously sat.  As a result, JCI determined that additional groundwater monitoring was necessary in this area.  JCI incurred $1,200.00 in costs due to the additional groundwater testing.

After SRP's break-up of the slab, a number of concrete rubble piles remained on the Property.  In order to continue to monitor the groundwater and soil in the area and to execute previously planned corrective measures, JCI required specialized drilling and excavating equipment because of the concrete rubble that remained on the Property.  By leasing this specialized equipment, JCI incurred an additional $4,600.00 in costs above what it would have spent had the rubble piles been removed by SRP.

The contaminated soils that were previously underneath the slab have not been removed.

### Legal Analysis and Conclusions of Law

I.    SRP's Citizen Suit to Enforce Paragraph 13 of the AOC:

SRP's only remaining claim against JCI is that JCI breached its obligations under paragraph 13 of the AOC.  In its October 17, 2011 Opinion & Order, this Court ruled that JCI's obligations imposed by paragraph 13 of the AOC are unclear (i.e., ambiguous).

The parties agree that the AOC should be construed using basic principles of contract interpretation.  Under generally accepted breach of contract principles, when a provision of a contract is ambiguous, the fact-finder may look to relevant extrinsic evidence, such as the understanding of the parties to the contract, the parties' conduct, and the statements of their

20

representatives.  *See e.g. Profit Pet v. Arthur Dogswell, LLC*, 603 F.3d 308, 314 (6th Cir. 2010).

SRP, as the party alleging that JCI has breached the terms of the AOC, has the burden of

proof as to this claim.  Thus, in order to prevail on its claim at trial, SRP was required to

establish: 1) what JCI's obligations are under paragraph 13 of the AOC; 2) how JCI breached

those obligations; and 3) that the Court should order relief for any established breach(es).

There is no dispute that JCI submitted its EI Report by the February 1, 2004 deadline.

SRP, however, contends that JCI breached paragraph 13 because it did not adequately

*demonstrate* that all current human exposures to contamination at or from the facility are under

control, and that migration of contaminated groundwater at or from the facility is stabilized.

A.    SRP Has Not Established JCI's Specific Obligations Under Paragraph 13 of the
      AOC.

Paragraph 13 of the AOC sets forth two very broad requirements for JCI.  To fully

comply with paragraph 13, JCI must demonstrate "[a]ll current human exposures to

contamination at or from the facility are under control," and that "[m]igration of contaminated

groundwater at or from the facility is stabilized."  (AOC at ¶13).  The parties do not dispute these

general obligations under paragraph 13.  While the nature of some demonstrations required under

the AOC are discussed within paragraph 13, 11(b) and 14, all three environmental experts,

including Shoaff, who testified on behalf of SRP, testified that the specific actions taken to

"demonstrate" the requirements of paragraph 13 *are within the discretion of the environmental

consultant conducting the investigation*.

SRP focused on a number of alleged deficiencies by JCI regarding the environmental

indicator demonstrations it made during the course of its field investigation and subsequent

submission of the February 1, 2004 EI Report.  These alleged demonstration deficiencies include:

- Not fully characterizing the easterly adjacent property (the 237 Monroe parcel);

- Failing to address whether humans residing in homes on the adjacent property are exposed to vapor intrusion;

- Not testing the soil and groundwater directly underneath the Building slab for contaminates;

- Lacking data points sufficient to understand the nature and extent of groundwater contamination and migration at the Property;

- Failing to discover a contaminated surface impoundment to the south of the Building;

- Failing to discover storm drains under the Building that could be a source of contamination; and

- Failing to discover a sub-grade, concrete vault containing water and sludge under the northeast portion of the Building.

Because SRP failed to establish that these allegedly required actions were obligations under paragraph 13 and fall outside the scope of Thomson's and Entact's discretion, the Court finds that SRP has failed to meet its burden of proof on this issue.  Thomson consistently testified that specific actions taken by JCI to meet the general obligations under the AOC, specifically those pursuant to paragraph 13, are left to the professional judgment of the environmental consultant conducting the field investigation.  Some of these specific actions include: determining soil and groundwater sampling locations, which relevant EPA guidance documents apply to the site investigation, whether to conduct a risk assessment for current conditions, what is considered a legitimate, complete pathway between contamination and human receptors, what corrective measures are needed to stabilize the migration of contaminated groundwater, and identifying unacceptable human exposures to contaminates, among other

details.

Similarly, John Osborne, JCI's environmental consultant with GZA, testified as follows

during SRP's redirect examination of Osborne:

Q:     Okay.  Neither the AOC nor the guidance in terms of environmental
       demonstrations tells you specifically how to investigate a particular site; is that
       correct?
A:     I'd agree with that, yes.
Q:     So therefore, the specifics of an investigation, while they give you guidance as to
       what you're supposed to show, is left to the professional judgment of the
       environmental consultant or the owner who is responsible for making those
       demonstrations, correct?
A:     I would say yes.

(6/22/2012 Trial Transcript at 29).

Even Brett Shoaff, SRP's environmental consultant, testified that the determination of

soil and groundwater monitoring locations is left to the discretion of the managing environmental

consultant.  Shoaff testified:

Q:     Where is the bright line? Where is the line that tells us when the report is adequate
       or inadequate? Is it a professional judgment?
A:     That's part of it, yes.
Q:     So we are putting your professional judgment up against [Thomson's]
       professional judgment; is that right?
A:     I suppose.

(6/26/2012 Trial Transcript at 38).

The Court finds that Thomson was a credible witness and the Court has no reason to

question her professional judgment.  Thomson is an accomplished hydrogeologist with decades

of experience conducting environmental field investigations and previous experience working

under consent decrees issued by the EPA.  Thomson also has had significant experience working

with RCRA sites and preparing environmental indicator reports.[9]  SRP did not establish that the

EPA ever questioned Thomson's professional judgment with regard to the demonstrations made

under paragraph 13 of the AOC.  Tellingly, SRP did not call any witnesses from the EPA to

testify that JCI breached its obligations under paragraph 13.  Nor did SRP present any

correspondence from the EPA indicating that the EPA believed JCI to be in violation of

paragraph 13.  Instead, SRP has attempted to prove that JCI violated paragraph 13 of the AOC

through the EPA's requests for additional testing and monitoring of the Property.  Rather than

supporting SRP's position that JCI violated obligations under paragraph 13, the EPA's requests

for additional investigation, and the fact that the EPA has never found JCI's EI Report to be

deficient or demanded the payment of stipulated penalties, establish that *compliance with the*

*AOC is a dynamic and continual process*.  In fact, paragraph 13 explicitly requires JCI to "collect

monitoring and measurement data in the future as necessary to verify that migration of any

contaminated groundwater is stabilized."  (AOC at ¶ 13(b)).  Thus, it improper to infer that the

EPA's requests to JCI to conduct additional investigations after its submission of the February 1,

2004 EI Report, alone, are evidence of a breach of paragraph 13 of the AOC.

Accordingly, the Court finds that SRP has not established, by a preponderance of the

evidence, that JCI's environmental indicator demonstrations were deficient or that JCI breached

its obligations under paragraph 13 of the AOC.

> B.    Even If SRP Had Established JCI's Specific Obligations, SRP Has Not
>        Established That JCI Breached Any of its Obligations Under Paragraph 13.

---

[9]Unlike Thomson, Shoaff, who was SRP's only expert witness, had never previously worked on a RCRA investigation or been involved with a RCRA consent order issued by the EPA.  Shoaff has also never prepared an environmental indicators report.

Even if SRP had established JCI's specific obligations under paragraph 13, SRP has failed to established that any of JCI's alleged obligations have been breached.

Many of the alleged "breaches" raised by SRP during trial are actions that were entirely consistent with JCI's ongoing obligations under the AOC or are simply based on information that JCI could not have reasonably known at the time of its EI Report submission. The only witness to testify that JCI did not meet its obligations under paragraph 13 was Shoaff. Other than providing conclusory remarks of noncompliance, however, Shoaff was unable to explain why any exposures were "significant or unacceptable" or how newly-discovered contaminates could have been known or reasonably known to Entact and JCI by February 1, 2004. For example, certain floor drains underneath the Building that Canopus determined were likely sources of contamination and a concrete vault containing sludge were found by Canopus only after demolition of the Building. JCI's EI Report was submitted to the EPA well before the Building was demolished, and therefore JCI and Entact could not have known about the floor drains. Similarly, the contaminated impoundment area was accidentally discovered by a third-party conducting a geotechnical investigation to determine load bearing characteristics of the soil, and not as part of an environmental investigation. In fact, Shoaff testified that he does not believe Thomson knew about the surface impoundment or the pipe that leads from the Building to the impoundment.[10] Also, with respect to the alleged vapor exposure to adjacent residents, Shoaff admitted that there has never been a demonstration, by Canopus or any other environmental consultant who has investigated the Property, that contaminates are migrating off the property.

---

[10]Groundwater testing underneath the surface impoundment revealed that the groundwater contamination in that area did not exceed residential drinking standards.

25

Finally, Shoaff admitted that, *at the time of JCI's EI demonstration*, none of the monitoring wells located down-gradient to the Property suggested that contamination was leaving the Property via the migration of groundwater.  Therefore, JCI's alleged lack of data points monitoring groundwater contamination did not affect its demonstration that the migration of contaminated groundwater at or from the facility is stabilized.

Furthermore, it is important to note that in 2004 the Property was zoned for industrial use. Thomson testified that the EI Report was a "snapshot in time" of the environmental indicators in February of 2004.  Once SRP purchased the land for residential development and conducted its own field investigation with Canopus, SRP reported additional contaminates in locations not previously tested by JCI.  The EPA then asked JCI to further investigate the findings of Canopus. As provided in the CA 725 and CA 750 forms JCI submitted with its EI Report at the request of the EPA, the "Current Human Exposures Under Control" environmental indicators are "for *reasonably expected* human exposures under *current land- and groundwater-use conditions ONLY and do not consider potential future land- or groundwater-use conditions* or ecological receptors."  (CA 725, CA 750, Exhibit DX-64 at Appendix G) (emphasis added).  SRP, however, did not establish that JCI was under any obligation to tailor its EI demonstrations under paragraph 13 to SRP's future residential plans for the Property.

Accordingly, the Court finds that SRP has not met its burden of proof that by a preponderance of the evidence JCI breached its obligations under paragraph 13 of the AOC.[11]

---

[11]In its Complaint, SRP requests that this Court "require [JCI] to complete removal of hazardous waste and hazardous waste constituents necessary to allow unrestricted residential use of the property within sixty (60) days."  (Complaint at ¶ 52).  The cleanup of the Property has proven to be a multi-year process.  Even if the Court were to find that JCI breached an obligation under paragraph 13 of the AOC, the Court would not exercise its discretion and order the relief

II.    JCI's CERCLA Counterclaim Against SRP:

JCI brought cost recovery counterclaims against SRP under CERCLA and NREPA. Specifically, JCI alleges that SRP's break-up of the concrete floor slab caused a release or threat of release of contaminates, which in turn caused JCI to incur response costs.  JCI previously suggested that the slab be used as an engineered barrier against rainwater infiltrations into the contaminated soils and groundwater beneath the slab.

In order to establish liability for cost recovery under § 107(a) of CERCLA,[12] JCI was required to establish the following four elements: 1) the site is a "facility" within the statute's definition; 2) a release or threatened release of hazardous substance has occurred; 3) the release caused JCI to incur "necessary costs of response"; and 4) SRP falls within one of the four categories of potentially responsible parties ("PRPs").  Although § 107(a) does not require a plaintiff to show that the defendant caused the release or the incurrence of response costs, the plaintiff must still show that a release, or threat of release, of a hazardous substance has actually occurred.  *Kalamazoo River Study Group v. Menasha Corp.*, 228 F.3d 648, 655-59 (6th Cir. 2000); *see also United States v. Township of Brighton*, 153 F.3d 307, 329 (6th Cir.1998) (Moore, J., concurring in the result) ("In the absence of a proximate causation requirement, CERCLA imposes liability on a generator of hazardous waste at a particular facility even though that generator's acts may not directly have caused or contributed to the contamination, or even where their waste may have comprised only a small portion of the waste present at the site.") (citations

_____

requested – taking over a multi-year cleanup effort that the EPA is in far a better position to conduct.  Additionally, the Court would not order the payment of millions of dollars in stipulated penalties, which are not even paid to SRP, for such a breach.

[12]Section 107(a) of CERCLA is codified at 42 U.S.C. § 9607(a).

omitted).

NREPA is the Michigan counterpart to CERCLA and is to be construed in accordance with the federal statute.  Therefore, the NREPA analysis is nearly identical to the above CERCLA analysis as to whether there was a "release" that caused "necessary response costs."

The term "release" is broadly defined in the CERCLA statute as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment . . ."  42 U.S.C. § 9601(22); *see also Bob's Beverage, Inc. v. Acme, Inc.*, 264 F.3d 692, 696 n.2 (6th Cir. 2001).  Even where there is no human activity involved in the movement of hazardous substances on a property, there can still be a "release." *United States v. 150 Acres of Land*, 204 F.3d 698, 706 (6th Cir. 2000).

At the summary judgment stage of this action, the parties did not dispute that the Facility is a "facility" within the statute's definition.  Thus, the issues at trial focused on the three remaining elements of a CERCLA cost recovery claim.

A.     JCI Has Only Incurred $1,200 In Response Costs Resulting From A Release Or Threatened Release Of Contaminates.

In this case, JCI has established only that the demolition of the slab required JCI to conduct some additional groundwater monitoring as a result of a threat of a release of VOCs. Osborne testified that the majority of JCI's additional costs were not caused by a release of contaminates, but that JCI incurred additional costs because it was required to lease more expensive equipment as result of the change in the Property's terrain after the slab was demolished.  Osborne stated, "[B]ecause of the rubble, the concrete rubble on the surface, we needed to incur costs for an excavator to level off the surface to place our water collection

28

tanks." (6/22/2012 Trial Transcript at 6). Osborne previously testified that this same rubble was not contaminated and that the MDEQ determined it could be disposed in a normal landfill, as opposed to one specifically used for contaminated waste. JCI has not established that the release, or threat of release of hazardous substances actually caused JCI to incur these additional costs. The testing and excavating that required the lease of specialized equipment were obligations already set forth in the AOC. They were not part of a response to a release of contaminates.

The Court concludes that JCI is entitled to recover $1,200.00 from SRP as a result of its additional groundwater monitoring triggered by the threat of a rise in VOCs from the demolition of the slab. All other additional costs incurred by JCI were not caused by a release or threat of release of hazardous substances, but by SRP's failure to remove the concrete rubble. Additional costs of previously-planned actions incurred as a result of concrete obstacles are not costs recoverable under CERCLA because they were not caused by a release of contaminates.

B.    JCI's Future Response Costs are Speculative.

In order to sustain a claim for cost recovery under CERCLA, JCI must have incurred "necessary costs of response," including costs of removal or remedial action. *Ford Motor Co. v. Michigan Consolidated Gas Co.*, 2010 WL 3419502 (E.D. Mich. 2010). "[C]osts of removal may include 'such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances.' 42 U.S.C. § 9601(23)." *Id.* "Monitoring and evaluation costs may be recovered as 'removal' costs under CERCLA if they were reasonable, and the activities were not scientifically deficient or unduly costly." *Village of Milford v. K-H Holding Corp.*, 390 F.3d 926, 933 (6th Cir. 2004).

In addition to failing to establish that a release of contaminated substances caused JCI to

29

incur the majority of its claimed additional costs, JCI failed to establish at trial that it will incur future response costs.  Osborne testified that the slab demolition *may* impact the cost of future corrective measures on the Property.  Other than the additional $1,200.00 incurred from additional monitoring, JCI has not established that any additional costs have actually been incurred.  Any future costs related to response actions or corrective measures resulting from a release of hazardous substances are purely speculative. The Court finds that JCI has not met its burden of establishing that a "release" or "threat of release" of contaminates will cause JCI to incur future response costs.

### Conclusion & Order

For the reasons set forth above, the Court concludes that JCI has not breached its obligations under paragraph 13 of the AOC.  Accordingly, SRP's only remaining claim to enforce the EPA order fails.

Furthermore, as to JCI's counterclaim, the Court concludes that JCI is entitled to response cost damages against SRP in the amount of $1,200.00.  The Court declines to issue a declaration that SRP is liable for any future response costs as a result of SRP's demolition of the concrete slab.

The parties are hereby directed to meet and confer and submit to the Court, within (14) days of the date of this Opinion, a proposed final judgment that is consistent with the Court's rulings in this Opinion and Order.

S/Sean F. Cox                                        
Sean F. Cox
United States District Judge

Dated:  August 13, 2012

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Saline River Properties, LLC,
a Michigan limited liability company,

      Plaintiff,

v.                                                                          Case No. 10-10507

Johnson Controls, Inc., a Wisconsin                  Honorable Sean F. Cox
corporation,

      Defendant;

-and-

Johnson Controls, Inc., a Wisconsin
corporation,

      Counter-Plaintiff,

v.

Saline River Properties, LLC,
a Michigan limited liability company,

      Counter-Defendant.

_____/

PROOF OF SERVICE

    I hereby certify that a copy of the foregoing document was served upon counsel of record

on August 13, 2012, by electronic and/or ordinary mail.

                                     S/Jennifer Hernandez_____
                                     Case Manager